*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re WRIGHT, Minors.

UNPUBLISHED
August 15, 2019

No. 346194
Oakland Circuit Court
Family Division
LC No. 2016-847902-NA

Before: SHAPIRO, P.J., and GLEICHER and SWARTZLE, JJ.

PER CURIAM.

The circuit court terminated respondent-father's parental rights to his young son and daughter under MCL 712A.19b(3)(c)(*i*), (g), and (j), based on his history of substance abuse, failure to protect his children from their mother's substance abuse, and failure to timely participate in and benefit from services. Respondent concedes that his young son, BW, has special needs that are best met in the continued care of his maternal aunt and does not challenge the termination of his parental rights to that child. With regard to his daughter, SW, however, respondent contends that the Department of Health and Human Services (DHHS) made insufficient reunification efforts, and that the court lacked clear and convincing evidence to support the cited termination factors and erroneously determined that termination was in SW's best interests. We acknowledge that respondent, once incarcerated during these proceedings, was unusually proactive in seeking out services and showed promise of benefit in the future. Nevertheless, the record supports that significant change could not be achieved within a reasonable time given SW's age, and that termination of respondent's parental rights was in the child's best interests. We affirm.

## I. BACKGROUND

Respondent and his girlfriend, Tanya Prichard, have two children together. SW was born on January 20, 2016, with cocaine in her system. Child Protective Services (CPS) opened a case and attempted to provide services for the family, but the family was unresponsive. Less than nine months later, the couple's second child, BW, was born at 29 weeks. He had both cocaine and marijuana in his system. During this second pregnancy, Prichard's sister, Melissa MacEachran, agreed to adopt the baby but instructed Prichard to obtain prenatal care and stop using drugs. Prichard did neither. CPS took BW into care while he remained in the hospital and

`-1-

the infant was placed with his aunt upon his release. CPS also tried to immediately take SW into care, but her parents evaded the agency for several days. SW was initially placed with MacEacharn, who was overwhelmed by caring for two infants, one with special needs. SW was eventually placed in nonrelative foster care as a result.

To respondent's credit, CPS investigators found the home he shared with Prichard to be appropriate and filled with the items needed by his children. He also worked full-time, adequately financially providing for his family. However, respondent was on probation for drug and driving-related convictions, had warrants for probation violations, and feared arrest. He spoke to caseworkers only by phone and deliberately failed to attend any court proceedings or service meetings. He also avoided parenting time. As a result, respondent has not seen his children since October 2016. The court took jurisdiction over the children without respondent having appeared. The court adopted the DHHS's recommended parent-agency agreement, requiring respondent to complete substance abuse treatment, participate in random drug screens, attend counseling, obtain suitable housing and maintain employment, attend parenting classes and supervised parenting time, and submit to a psychological evaluation.

Respondent maintained that he had been clean for four or five years, but relapsed into cocaine and alcohol abuse after the children were removed. In early 2017, he was arrested on a new charge of cocaine possession and violating probation. Respondent remained incarcerated at various facilities until July 10, 2018. He was a model prisoner and was paroled on his earliest release date. Respondent sought out services within the system and actively participated in substance abuse counseling and AA/NA meetings. He earned his GED, learned job hunting skills, and worked while incarcerated. Respondent also participated in classes designed to teach better decision-making and various life skills. Parenting classes were not available to respondent at any of the facilities where he was housed. Respondent applied to take a correspondence course, but was released before the application was answered. The DHHS unsuccessfully attempted to arrange respondent's psychological evaluation while he was incarcerated.

In the meantime, the DHHS filed a supplemental petition seeking termination of both parents' rights on November 22, 2017. Following a February 1, 2018 hearing, the circuit court found statutory grounds to terminate both parents' rights. The court found that respondent had not complied with his parent-agency agreement before his incarceration. The court acknowledged respondent's admirable efforts while incarcerated, but noted that he had "a long road ahead." Moreover, respondent had not seen his children "for a significant period of time." Accordingly, the court determined that respondent would be unable to rectify the conditions that led to adjudication within a reasonable time given the children's ages, supporting termination under MCL 712A.19b(3)(c)(*i*). The court found termination supported under factor (g), failure to provide proper care and custody, because at that time it was still unknown when respondent would be released from prison. The court also cited respondent's earlier failure to begin services because he was absconding from the law. The court further noted that respondent continued to use substances until he was eventually apprehended and arrested. Although again acknowledging respondent's admirable efforts while incarcerated, the court determined that respondent would be unable to provide proper care and custody within a reasonable time. Finally, the court found termination supported under factor (j) because the parents' "failures to maintain drug-free lifestyles establish[ed] that [they] [were] incapable of making appropriate and sound decisions to keep [their children] out of harm's way." The court noted that respondent

was then incarcerated and had been "provided with an abundance of services" but had "neglected to utilize . . . them to proactively improve [his] life."

The court conducted a separate best-interest hearing three days after respondent's prison release. Respondent indicated that he had moved in with his father and would be starting a job soon with an asphalt company. He planned to save up for his own place. He had already met with the foster care worker and expressed a desire to start drug testing and parenting classes. As the termination petition was pending, however, the DHHS could not refer him for services. In order to maintain his sobriety and safely care for SW, respondent indicated that he had decided to not resume his relationship with Prichard. Prichard had listed her address as respondent's father's home, but respondent indicated that she was not actually living at that address. Unfortunately, MacEachran and others testified that Prichard did stay periodically at that home. Respondent continued to concede that it was in BW's best interests to remain with MacEachran.

Ultimately, the court found termination of both parents' rights to be in the best interests of both children. Relevant to respondent, the court explained that he had not seen the children since October 2016 and therefore had no parent-child bond. The lack of contact before his incarceration was respondent's own responsibility as he placed avoiding arrest over connecting with his children. Further, respondent avoided all services until his incarceration. Again, the court appreciated that respondent had made "very positive steps in turning his life around," but determined that "there [was] no indication that he would have any ability whatsoever to properly parent" his children in the future. The court expressed concern that respondent would resume his unhealthy relationship with Prichard as evidence established that both were living, at least intermittently, in the same home. If the children were placed in respondent's care, they would therefore be subjected to their mother's continued drug use and be placed in "a substantial risk of harm." Overall, the children had no relationship with respondent, were bonded with their caregivers, and were receiving excellent care.

Respondent now appeals the termination of his parental rights to SW. We note that the children's mother has not appealed the termination of her rights to either child.

## II. REASONABLE REUNIFICATION EFFORTS

Citing *In re Mason*, 486 Mich 142; 782 NW2d 747 (2010), respondent contends that the DHHS made insufficient reunification efforts in this case simply because he was incarcerated. *Mason*, 486 Mich at 152, reminded courts that "[r]easonable efforts to reunify the child and family must be made in all cases" under MCL 712A.19a(2), absent very specific aggravating circumstances. "The state is not relieved of its duties to engage an absent parent merely because that parent is incarcerated." *Mason*, 486 Mich at 152. In *Mason*, the incarcerated father initially left his children with their mother. When the DHHS intervened with the family, the parents arranged for relatives to care for the children. *Id*. at 146-148, 150. The court did not involve respondent in court hearings for several months due to his incarceration. *Id*. at 148. It was unclear whether the DHHS ever supplied the parent-agency agreement to the respondent-father and it was certain that neither the caseworker nor the court "ever facilitated respondent's access to services and agencies or discussed updating the plan." *Id*. at 156. The state erred in focusing all its energy on the custodial mother

and, in doing so, disregarded respondent's statutory right to be provided services and, as a result, extended the time it would take him to comply with the service plan upon his release from prison—which was potentially imminent at the time of the termination hearing. The state failed to involve or evaluate respondent, but then terminated his rights, in part because of his failure to comply with the service plan, while giving him no opportunity to comply in the future. This constituted clear error. [*Id.* at 159.]

The result was " 'a "hole" in the evidence on which the trial court based its termination decision.' " *Id.* at 160, quoting *In re Rood*, 483 Mich 73, 127; 763 NW2d 587 (2009) (YOUNG, J., concurring in part).

The circumstances in this case are distinguishable from *Mason*. The DHHS quickly developed a service plan for respondent in this case. However, respondent declined to begin services because he was afraid of being arrested. Once incarcerated, the DHHS caseworker maintained contact with respondent via letter. She also contacted respondent's prison counselor. The DHHS could not refer respondent for services while he was incarcerated, but the caseworker kept abreast of the programming in which respondent engaged. She also tried to arrange a psychological evaluation for respondent while he was incarcerated but was unsuccessful due to no fault of the agency. This was not a case where the DHHS failed to engage a noncustodial or incarcerated parent and the DHHS's inaction did not leave a "hole" in the evidentiary record.

Another distinction between the current case and *Mason* is that in *Mason*, the children were at all times placed in the care of relatives by their parents. In assessing whether an incarcerated parent will be able to provide proper care and custody in the future, *Mason* directed that courts should consider whether the parent "could fulfill his duty to provide proper care and custody in the future by voluntarily granting legal custody to his relatives during his remaining term of incarceration." *Id.* at 163. As respondent only appeals the termination of his parental rights to SW, BW's voluntary relative placement is not relevant here. Although SW was initially placed with her maternal aunt, she was ultimately transferred to nonrelative foster care. Respondent recommended a cousin to take custody of SW and as a stay-at-home mother of four children, it seems likely this placement would have been appropriate. However, the relative did not follow through with the home study. Respondent therefore was unable to provide surrogate care and custody through relatives for SW.

### III. STATUTORY GROUNDS FOR TERMINATION

Respondent next challenges the evidentiary support for the statutory termination factors relied upon by the court. Pursuant to MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" that at least one statutory ground has been proven by the DHHS. MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). The court's termination decision followed the filing of a supplemental petition. When termination is sought in a supplemental petition based on new grounds, the DHHS must present legally admissible evidence in support. *In re DMK*, 289 Mich App 246, 258; 796 NW2d 129 (2010). We review for clear error a circuit court's factual finding that a statutory termination ground has been established. *Rood*, 483 Mich at 90-91. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a

-4-

mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (cleaned up).[1] "Clear error signifies a decision that strikes us as more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009).

The circuit court determined that statutory grounds supported termination on February 1, 2018, but did not terminate respondent's parental rights until July 2018, following a best-interest hearing. At the time of the termination hearing, the relevant portions of MCL 712A.19b(3) provided:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[2]
>
> * * *

---

[1] This opinion uses the new parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, Cleaning Up Quotations, 18 J App Pract & Process 143 (2017).

[2] Effective June 1, 2018, the Legislature amended MCL 712A.19b(3)(g) in 2018 PA 58, to provide: "The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." As the circuit court resolved this issue before the amendment's effective date, the prior version of the statute controls. And ultimately, the statutory amendment is not outcome determinative in this case as the court also substantiated termination on two other grounds.

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The evidence substantiated termination under factor (c)(*i*). The court took jurisdiction over the children in relation to respondent based on his unaddressed substance abuse issues and failure to cooperate with CPS following SW's birth. The court noted respondent's decision to continue driving with a suspended license, to avoid addressing his legal issues, and to avoid services in exchange for his freedom. Termination under (c)(*i*) is appropriate "when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services[.]" *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014) (cleaned up). A parent must "demonstrate sufficient compliance with or benefit from those services specifically targeted to address the primary basis for the adjudication in th[e] matter[.]" *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Respondent never actually participated in services through DHHS referrals. While incarcerated, respondent did attend substance abuse counseling and attended regular AA/NA meetings. He participated in programs to improve his decision-making skills and to learn various life skills. To his credit, respondent internalized these lessons, was a model prisoner, and was paroled on his earliest release date. Respondent certainly showed admirable improvement.

However, respondent had yet to demonstrate that he could maintain sobriety in the community at the time of the termination and best-interest hearings. He also had yet to begin a parenting class or participate in supervised parenting time to demonstrate that he could safely parent his children. The evidence supported that respondent would be unable to rectify the conditions that led to adjudication within a reasonable time and substantiated termination under factor (c)(*i*).

Respondent attempted to provide proper care and custody for SW before his incarceration. Respondent worked full-time and provided for SW's basic needs. The family's home was appropriate and was stocked with the baby's needs. Respondent had not ensured that SW remained up to date on her vaccinations, however, while the child remained in his care. Once SW was removed from her parents' custody, respondent stopped providing for his child. He did not attend supervised parenting sessions with SW before his incarceration. An incarcerated parent may "achieve proper care and custody through placement with a relative." *In re Pops*, 315 Mich App 590, 595; 890 NW2d 902 (2016). Although SW was initially placed with a maternal aunt and respondent recommended another relative placement, SW ended up in nonrelative care. Respondent did not send letters or cards to his child while he was in prison. Termination was therefore supported under factor (g), as it existed at the time of the termination hearing.

Termination was further substantiated under factor (j). Although respondent did much to care for his children before their removal, he did not protect them from their mother's in utero drug abuse. It appears that respondent did not abuse cocaine or alcohol while SW was in his custody. However, respondent admitted that he relapsed into cocaine and alcohol abuse after the court became involved. To protect his children in the future, respondent would have to establish his own sobriety and protect the children from their mother's continuing substance abuse issues. While incarcerated, respondent participated in substance abuse counseling and attended AA/NA

meetings. However, it would take time for respondent to demonstrate his ability to remain sober in the community. Moreover, the DHHS presented evidence that respondent would subject the children to harm in the future by allowing their mother access. Prichard did not comply with her parent-agency agreement and continued to use substances throughout the proceedings. The court terminated her rights as well and she has not appealed. Indeed, Prichard has lost custody to a total of four children in her life and yet continued to use substances that harmed her offspring. Respondent knew Prichard used cocaine and marijuana and did not attempt to prevent Prichard from using substances while pregnant. Moreover, there is evidence that Prichard would live in the same home as respondent upon his prison release. Under these circumstances, we cannot find clear error in the circuit court's decision.

## IV. BEST INTERESTS

Respondent finally contends that termination of his parental rights was not in SW's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The court should weigh all the evidence available to it in determining the child's best interests. *Trejo*, 462 Mich at 356-357. Relevant factors include "the child's bond to the parent, the parent's parenting ability, [and] the child's need for permanency, stability, and finality. . . ." *Olive/Metts*, 297 Mich App at 41-42 (cleaned up). The advantages of the child's foster placement over placement with the parent are a relevant consideration. *In re Foster*, 285 Mich App 630, 634-635; 776 NW2d 415 (2009). "The trial court may also consider . . . the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *White*, 303 Mich App at 714.

Respondent clearly loves his children and has worked hard while in prison to regain custody of SW. However, as aptly noted by the court, SW no longer has any bond with respondent. SW has been in foster care since she was nine months old and has not seen her father since. Her foster family wants to adopt and has expressed willingness to allow SW to visit with her biological family. Accordingly, termination of respondent's parental rights will not completely sever the parent-child relationship.

Moreover, despite the progress made by respondent while he was incarcerated, he had yet to establish his ability to provide a permanent, stable home free from substance abuse at the time of the best-interest hearing. Respondent had to begin his new job and find his own housing. Respondent had to continue his substance abuse treatment to ensure he could maintain sobriety

-7-

in the community. And respondent still had to undergo a psychological evaluation and participate in parenting classes. We commend respondent on the work he has completed, but unfortunately termination of his parental rights was in SW's best interests.

We affirm.

/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle